IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>    v.<br><br>CONOCOPHILLIPS COMPANY,<br><br>  Defendant. | Civil Action No. 6:11-cv-167 |

## COMPLAINT

Plaintiff, the United States of America, by the authority of the Attorney General of the United States of America, acting at the request of the United States Department of the Navy (the "Navy), by and through its undersigned attorneys, files this complaint and alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action, brought against the ConocoPhillips Company ("ConocoPhillips") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 – 9675, and the Texas Solid Waste Disposal Act, Texas Health & Safety Code Ann. §§ 361.001 to 361.966 (hereafter citations to this statute will be in the form "TSWDA § 361.xxx"). The Navy responded to releases and threatened releases of solid wastes and hazardous substances at the Naval Weapons Industrial Reserve Plant in McGregor, Texas ("NWIRP McGregor") and the adjacent areas where such solid wastes and hazardous substances have come to be located (collectively, the "NWIRP McGregor Site"). The NWIRP McGregor Site is located in McLennan and Coryell Counties. Plaintiff seeks to recover response costs incurred, and to obtain a declaratory judgment as to liability for response costs to

be incurred, for responding to the releases and threatened releases of solid wastes and hazardous substances at and from the NWIRP McGregor Site.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 (federal question); 1345 (United States as plaintiff); and CERCLA Section 113(b), 42 U.S.C. § 9613(b) (jurisdiction; venue).

3. Venue is proper in the Western District of Texas pursuant to 28 U.S.C. §§ 124 (Western District of Texas, Waco Division includes McLennan and Coryell Counties) and § 1391(b) (venue, generally), and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b) (jurisdiction; venue), because the releases of solid wastes and hazardous substances at or from the NWIRP McGregor Site occurred in this district and because the events or omissions giving rise to the claims herein occurred in this district.

## PARTIES

4. ConocoPhillips is incorporated under the laws of the State of Delaware and is the successor to a corporation that did business during relevant times in the State of Texas.

5. In 2002, Phillips Petroleum Co. merged with Conoco, Inc. to form ConocoPhillips.

6. ConocoPhillips is the successor in interest to Phillips Petroleum Co.'s liabilities associated with NWIRP McGregor.

7. ConocoPhillips is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

8. The Navy is authorized to perform response actions under CERCLA and the Defense Environmental Restoration Program ("DERP"), 10 U.S.C. §§ 2701-2710, on land under

the Navy's jurisdiction, custody, or control, as well as on other lands to which releases from said lands have come to be located.  Executive Order 12,580, § 2(d) (January 23, 1987), as amended by Executive Order 13,016 (August 28, 1996).  The Navy has conducted response actions at the NWIRP McGregor Site pursuant to its response authorities under Section 104 of CERCLA, 42 U.S.C. § 9604, and under DERP.

9. Authority to bring this action on behalf of the United States is vested in the Department of Justice pursuant to 28 U.S.C. §§ 516 (conduct of litigation reserved to Department of Justice), and 519 (supervision of litigation), and Executive Order 12,580 § 6 (January 23, 1987).

## GENERAL ALLEGATIONS

### Operations and Operators at NWIRP McGregor

10. NWIRP McGregor (formerly known as the Blue Bonnet Ordnance Plant and as Air Force Plant 66) is situated on an irregularly shaped parcel of land lying mostly in McLennan County with the westerly portion of the parcel lying in Coryell County.

11. Operations at NWIRP McGregor began during World War II.  Shortly after the end of the war, ownership of the facility was transferred to non-federal parties.

12. Federal operations revived on a portion of the original site in approximately 1952 and continued through 1995.  Post-war operations initially focused on development and production of jet assistance take-off boosters ("JATOs").  The facility subsequently began manufacturing high performance solid fuel rocket propellants.

13. In 1942, the U.S. Army Ordnance Corps ("the Army") established the Blue Bonnet Ordnance Plant on 18,000 acres of land in McGregor, Texas.  National Gypsum Co.

was awarded a contract for operation of the plant. Production at the Blue Bonnet Ordnance Plant ceased in 1945.

14. In 1946, the Blue Bonnet Ordnance Plant was transferred from the War Department to the War Assets Administration. Subject to a recapture provision, the land was conveyed to various entities.

15. In 1952, the U.S. Air Force re-acquired 11,450 acres of the former Blue Bonnet Ordnance Plant and renamed it Air Force Plant No. 66.

16. Under contract to the Air Force from 1952 to 1958, Phillips Petroleum Co., Rocket Fuels Division operated Air Force Plant No. 66.

17. Under contract to the Air Force from 1958 to 1959, Astrodyne, Inc. operated Air Force Plant No. 66.

18. Under contract to the Air Force from 1959 to 1966, North American Aviation Corp., Rocketdyne, Solid Rocket Division operated Air Force Plant No. 66.

19. In 1966, the property was transferred to the Navy. After the transfer, Air Force Plant No. 66 became a Naval Industrial Ordnance Plant, later re-designated a Naval Weapons Industrial Reserve Plant ("NWIRP").

20. Under contract to the Navy from 1966 to 1967, North American Aviation Corp., Rocketdyne, Solid Rocket Division operated NWIRP McGregor.

21. Under contract to the Navy from 1967 to 1978, North American Rockwell Corp. (renamed Rockwell International Corp. in 1973), Rocketdyne Division operated NWIRP McGregor.

22. In 1972, seventy acres of NWIRP McGregor were assigned to the Department of Health, Education and Welfare for conveyance to the McGregor School District.

23. In 1972, the NWIRP McGregor on-site sewage treatment plant and 33 surrounding acres were conveyed to the City of McGregor.

24. In 1974, 1,600 acres of NWIRP McGregor were transferred to a private entity.

25. Under contract to the Navy from 1978 to 2001, Hercules operated NWIRP McGregor.

26. As of March 15, 1995, Hercules had transferred to Alliant Techsystems Inc. most of the assets of the Hercules Aerospace Company, an unincorporated business unit of Hercules. The transferred assets included Hercules' contract with the Navy to operate NWIRP McGregor. Pursuant to a Novation Agreement, Hercules substituted Alliant Techsystems, Inc. as the operator from March 1995 to December 1995 when production ceased. Decontamination and rehabilitation continued until March 1997. The United States did not approve the Novation Agreement approving of the transfer of the contract from Hercules to Alliant Techsystems, Inc. until March 2001.

27. The National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, 110 Stat. 186 (February 10, 1996), section 2868, authorized the conveyance of the NWIRP McGregor property to the City of McGregor, Texas for purposes of economic redevelopment.

28. In a series of conveyances between 1996 and 2007, all of the land then owned by the Navy at NWIRP McGregor was transferred to the City of McGregor, Texas.

### Response Actions at the NWIRP McGregor Site

29. For purposes of investigation, the Navy subdivided NWIRP McGregor into discrete "Areas" (named Area A, Area B, etc . . .) based largely on historical use patterns. Some

Areas also included associated landfills.  The areas addressed in the Navy's investigation and cleanup are described in the table below:

| Table of Certain Designated Areas at NWIRP McGregor Subject to Investigation and Clean-Up ||
|---|---|
| **Area** | **Description** |
| A | Area A – Initially constructed in 1942 and used as an administration area.<br><br>Area A Landfill – a demolition debris landfill believed to have received building material from demolished administrative and housing structures in Area A. |
| B | Area B – Housing area used during World War II. |
| C | Area C – Initially constructed in 1942 and housed the Fire and Security Departments.  Included two incinerators and a bullet trap. |
| D | Area D – Initially constructed in 1942 and served as a machine shop.<br><br>Area D Landfill – primarily received construction and demolition debris, but also reported to have received drums of waste relocated form Area E Landfill.  Active from 1983 to early 1990s. |
| E | Area E – Initially constructed in 1942 and subsequently used for rocket motor case manufacturing, machine shops, vehicle repair, and storage.<br><br>Area E Landfill – Reportedly began operation around 1964 and operated as an open dump primarily received construction and demolition debris, empty drums, and drums of blasting sand. |
| F | Area F – Initially constructed in 1942 and used as an engineering laboratory and pilot production facility. |
| G | Initially constructed in 1942 and used for the production of ammonium nitrate.  Area G was used between 1950 and 1954 by Geigy Corp. for production of pesticides.  Area G was later used for storage by the Operating Contractors. |
| H | Area H – Initially constructed in 1942, Area H includes storage for explosives and other materials. |
| L | Area L – Initially constructed in 1942 as Bomb Loading Line No. 3.  Not used for a period of time until one building was used for static test firing of rocket motors and another building was used for propellant motor testing. |

| **Table of Certain Designated Areas at NWIRP McGregor Subject to Investigation and Clean-Up** ||
| Area | Description |
|---|---|
| M | Area M – Initially constructed in 1944 as Bomb Line No. 4, but never used. Converted to a manufacturing facility for ammonium perchlorate-containing solid rocket motors.<br><br>Area M Landfills – Two landfills are located in Area M – the "Area M Class II/III Landfill" and the "Area M Demolition Landfill." The Area M Class II/III Landfill was a 7 acre landfill operated from 1981 to 1995 and used for various materials. The Area M Demolition Landfill was a 2 acre landfill operated for a few months in early 1952 and used for demolition and construction debris. |
| P | Area P -- Railroad Shipping and Receiving |
| R | Area R – Constructed in the early 1950s and primarily used for testing rocket motors. |
| S | Area S – Initially began operations in 1942 and used for open burning and disposal of miscellaneous waste. Landfills and other waste burial sites were also located in Area S. Area S included an "Explosives Classification and Disposal Area" used to destroy off-specification and waste explosives and explosives-contaminated material. |
| T | Area T – Initially constructed in the mid-1950s and used for explosives storage, shipping, and receiving. |
| Z | Area Z – Open, undeveloped land between the other manufacturing areas. Investigations focused on two water towers, a former fire station and stables, and an electrical substation. |

30. In May 1978, the Navy began soil investigations at NWIRP McGregor. The objectives were to identify any soil contamination, evaluate any adverse effects to agricultural activities from the contaminants, and recommend clean-up procedures. The investigation evaluated conditions at four locations, but the primary focus was on pesticide contamination in what became known as Area G.

31. Beginning in summer 1981, the Navy commenced an Initial Assessment Study and produced a report dated March 1983. The Initial Assessment Study identified fourteen potentially contaminated locations and recommended that seven of those locations be subject to further study. Additional study was performed in the seven locations and a report dated August

1983 was prepared.  Of the seven locations recommended for further study, three were determined to have sufficient contamination to warrant cleanup.

32.     In 1989, state environmental officials conducted a Resource Conservation and Recover Act ("RCRA"), 42 U.S.C. § 9601 et seq., Facility Assessment ("RFA") at NWIRP McGregor.  The RFA identified four solid waste management units ("SWMUs") that required a RCRA permit and six SWMUs as having a high potential for release to the environment.  The RFA recommended that the Navy conduct a RCRA Facility Investigation ("RFI") at these units to determine the nature and extent of any soil and/or groundwater contamination.  From this point forward, remediation activities related to solid and hazardous waste at NWIRP McGregor were conducted under the Texas Industrial Hazardous Waste Corrective Action Program.

33.     In December 1991, the Navy completed the Final Preliminary Report for the RFI.  The report focused on eight units at the site including the six RFI units identified in the RFA and two additional units.  In November 1994, a RCRA Facilities Investigation, Preliminary Final Report was issued.  Of the eight units evaluated, seven were recommended for further investigation and one was recommended for no further action.  Additional field activities occurred in 1995 and 1996 and a Final RCRA Facility Investigation Report was issued in February 1996 which included specific recommendations for further characterization of contamination at the units covered by the report.

34.     In order to satisfy requirements related to the planned transfer of NWIRP McGregor to the City of McGregor, the Navy conducted a base-wide Environmental Baseline Survey ("EBS") from September 1995 to September 1996.  An EBS is required by Dept. of Defense policy for all transfers of real property.  The purpose of the EBS is to evaluate the entire property for its suitability to transfer, including identification of contaminated versus

uncontaminated property pursuant to or consistent with CERCLA Section 120(h)(4), 42 U.S.C. § 9620(h)(4).  At NWIRP McGregor, the EBS Report also served as one of the studies used to characterize environmental hazards for potential cleanup.  While some locations were deemed suitable for transfer to the City of McGregor, other locations were found to require additional investigation and/or cleanup.

35. In July 1998, the City of Waco collected samples from water sources near NWIRP McGregor and detected perchlorate contamination.  Significant public concern, including concerns about potential perchlorate contamination of nearby public water supplies, prompted the Navy to immediately begin collecting data on both onsite and offsite perchlorate contamination.  Available data was summarized in a report issued in September 1999.  The Navy continued to investigate perchlorate contamination through collection of surface water samples and installation of monitoring wells.

36. In February 1999, the Texas Natural Resources Conservation Commission (later renamed the Texas Commission on Environmental Quality ("TCEQ")) sent a letter to the Navy requiring the Navy to propose and implement "Interim Stabilization Measures" designed to address off-site migration of perchlorate.  Pursuant to state requirements, the Navy submitted a Draft Interim Stabilization Measure Evaluation in June 1999 which was approved by Texas.  Pursuant to the approved document, a large, broadly focused on and offsite perchlorate investigation was conducted.  In addition, the Navy constructed the following Interim Stabilization Measures designed to address off-site migration of perchlorate:

<u>Area M Groundwater Collection Trenches</u>:  These trenches collected perchlorate contaminated groundwater before it flowed off-site.  A lagoon to hold collected groundwater was constructed in 2000.  Heavy rainfall in December 2000 overloaded the

storage capacity for collected groundwater and, by March 2001, the Navy had expanded Lagoon A, constructed Lagoon B, and installed temporary storage tanks. Various techniques for treating the collected groundwater were evaluated and eventually a fluidized bed reactor was selected. Also, the Navy evaluated the addition of organic material to the trench as a means of facilitating biological treatment of perchlorate.

<u>Area M Soil Treatment Cells</u>: Perchlorate treatment cells were constructed. The treatment cells were designed to facilitate bioremediation of perchlorate contaminated soil. Initially, soils excavated from Area M were placed into the treatment cells and later tested to determine the effectiveness of the treatment technique. Later, the cells were also used to treat perchlorate contaminated soils from Areas F, H, and T.

<u>Area F Phyto Pilot Test</u>: The Phyto Pilot Test evaluated whether cottonwood trees planted in the path of perchlorate contaminated groundwater would be an effective treatment technology.

<u>Area F Biotrench Pilot Test</u>: Biotrenches were constructed in Area F in order to pilot test this treatment technology. A biotrench is a trench placed in the path of perchlorate contaminated groundwater and filled with organic material. Bacteria which break down perchlorate flourish in the trench and perchlorate levels are substantially reduced. A different mix of organic constituents was placed in each trench in order to evaluate its effectiveness. The pilot test demonstrated that the treatment technique was effective and, ultimately, it was used as part of the remedy in many areas of the NWIRP McGregor Site.

<u>Area T Perchlorate Contaminated Soil Removal</u>: Perchlorate contaminated soils excavated from Area T were placed in the Area M Soil treatment cells.

37. Groundwater investigations continued in several phases to collect data necessary to assess all groundwater contaminants and to evaluate risk to human and ecological receptors. Those investigations were documented in a series of reports submitted by the Navy to TCEQ. The final report submitted by the Navy pursuant to the February 1999 letter from the Texas Natural Resources Conservation Commission was dated August 2004 and titled *Groundwater Investigation Report, Phase III*. TCEQ approved that report on February 24, 2005.

38. At the same time the Navy was conducting Interim Stabilization Measures related to perchlorate, it also continued investigations related to the 1996 EBS. Investigations related to areas as to which the Navy determined it did not have sufficient information to characterize environmental hazards were referred to as the Gray Areas Investigation ("GAI"). A separate GAI was conducted for each such Area of NWIRP McGregor and separate, Area-specific Response Action Plans ("RAPs") were submitted to the state for approval.

39. The primary chemicals of concern identified in soil at the NWIRP McGregor Site include: volatile organic compounds ("VOCs"); semi-volatile organic compounds ("SVOCs"); polyaromatic hydrocarbons ("PAHs"); polychlorinated biphenyls ("PCBs"); total petroleum hydrocarbons ("TPH"); metals; and perchlorate. Contaminated soil did not extend beyond the plant boundaries. The primary chemicals of concern identified in groundwater include VOCs, explosives, and perchlorate. Groundwater contamination extended beyond the 1995 plant boundaries in four areas. The primary chemicals of concern identified in surface water (primarily Harris Creek, Tributary M, Tributary S, and Station Creek) included perchlorate.

40. On October 3, 2006, TCEQ issued Post-Closure Order Docket No. 2006-0347-IHW to the US Department of the Navy ("the 2006 PCO"). The 2006 PCO required Navy to

undertake all actions required by the terms and conditions of the PCO including the Technical Requirements specified in Attachment A, Technical Requirements.

41. Phillips Petroleum Co., as contractor who operated NWIRP McGregor, generated waste materials at the site from manufacturing and other processes, including but not limited to, solvents, lubricants and waste oils, paint sludges, and propellant.

**Relevant Statutory Provisions**

42. CERCLA Section 107(a), 42 U.S.C. § 9607(a)(2), provides in pertinent part that:

> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . . shall be liable for –
>
> > (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan. . . .

43. CERCLA defines "hazardous substance" to include, <u>inter alia</u>, "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [SWDA], 42 U.S.C. §6921." CERCLA Section 101(14)(C), 42 U.S.C. § 9601(14)(C).

44. Pursuant to 40 C.F.R. § 302.4(a), "[t]he elements and compounds and hazardous wastes appearing in table 302.4 are designated as hazardous substances . . . ." Trichloroethylene ("TCE") is a VOC and appears in table 302.4.

45. Pursuant to 40 C.F.R. § 302.4(b), a solid waste (as defined in 40 C.F.R. § 261.2), which is not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), is a hazardous substance under CERCLA Section 101(14) if it exhibits any of the characteristics identified in 40 C.F.R. §§ 261.20 through 261.24. Two of the identified characteristics are ignitability and reactivity. 40 C.F.R. §§ 261.21 & 261.23.

46. The perchlorate containing waste disposed of at the NWIRP McGregor Site was a solid waste (as defined in 40 C.F.R. § 261.2) which is not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b).

47. Some portion of the perchlorate containing waste disposed of at the NWIRP McGregor Site exhibited the characteristics of ignitability and/or reactivity, as defined at 40 C.F.R. §§ 261.21 & 261.23, at the time of disposal.  Accordingly, such perchlorate is a hazardous substance within the meaning of CERCLA Section 101(14).

48. The waste materials disposed of at the NWIRP McGregor Site contained "hazardous substances" including, but not limited to, perchlorate and trichloroethylene ("TCE"), within the meaning of CERCLA Section 101(14), 42 U.S.C. § 9601(14), and 40 C.F.R. § 302.4. These waste materials also contained "solid wastes" and "hazardous wastes," including but not limited to perchlorate and trichloroethylene ("TCE"), within the meaning of TSWDA § 361.003(12) & (35).

49. Solid wastes and hazardous substances have been discharged, deposited, injected, dumped, spilled, leaked, or placed into or on land or water at the NWIRP McGregor Site so that such solid wastes and hazardous substances have entered the environment or been emitted into the air or discharged into any soils and waters, including surface waters and groundwaters.

50. There has been a "disposal" of solid wastes and hazardous substances at the NWIRP McGregor Site, within the meaning of CERCLA Section 101(29) of CERCLA, 42 U.S.C. § 9601(29).

51. There have been "releases", as defined by CERCLA Section 101(22), 42 U.S.C. § 9601(22), or threatened release, of hazardous substances, to soils, surface waters, and groundwaters at the NWIRP McGregor Site.

52. Because hazardous substances have been released or otherwise come to be located at the NWIRP McGregor Site, the NWIRP McGregor Site is a "facility" within the meaning of CERCLA Sections 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

53. The Navy has selected and implemented multiple removal actions and remedial actions in response to the release or threatened release of hazardous substances at the NWIRP McGregor Site.

54. The response actions taken by the Navy at the NWIRP McGregor Site are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

55. The United States has incurred costs of response actions at the NWIRP McGregor Site within the meaning of Sections 101(23), (24) and (25) of CERCLA, 42 U.S.C. §§ 9601(23), (24) and (25), and will incur future costs for response actions at the NWIRP McGregor Site.

56. As a result of responding to the releases or threatened releases of hazardous substances at or from the NWIRP McGregor Site, the United States has incurred unreimbursed response costs, and prejudgment interest.

57. The United States will continue to incur response costs as a result of the releases or threatened releases of hazardous substances at or from the NWIRP McGregor Site.

## CLAIMS FOR RELIEF

### First Claim for Relief (CERCLA)

58. The allegations appearing in Paragraphs 1 through 57 above are realleged and incorporated herein by reference.

59. ConocoPhillips, as the successor in interest to Phillips Petroleum Co.'s liabilities associated with NWIRP McGregor, is liable as a "person who at the time of disposal of any

hazardous substance owned or operated" NWIRP McGregor, pursuant to CERCLA Section 107(a)(2), 42 U.S.C. § 9607(a)(2).

60. Pursuant to CERCLA Section 107(a), ConocoPhillips is liable for the ". . . costs of removal or remedial action incurred by the United States . . . not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

61. Pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a), ConocoPhillips is liable for response costs incurred by the United States for activities conducted at or in connection with the NWIRP McGregor Site, including related oversight costs and related indirect, administrative, investigative, and enforcement costs.

62. Pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a), the United States is entitled to recover interest on the response costs it has incurred.

63. Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), ConocoPhillips is liable with respect to the NWIRP McGregor Site for a "declaratory judgment on liability for response costs . . . that will be binding on any subsequent action or actions to recover further response costs."

## Second Claim for Relief (TSWDA)

64. The allegations appearing in Paragraphs 1 through 41 above are realleged and incorporated herein by reference.

65. TSWDA § 361.344 is titled "Cost Recovery by Liable Party or Third Party" and provides that:

> A person who conducts a removal or remedial action that is approved by the commission and is necessary to address a release or threatened release may bring suit in a district court to recover the reasonable and necessary costs of that action and other costs as the court, in its discretion, considers reasonable.

TSWDA § 361.344(a).

66.     TSWDA § 361.344(d) provides that "the court shall determine the amount of cost recovery according to the criteria prescribed by [TSWDA] Section 361.343."

67.     TSWDA § 361.343(a) provides that "[a]pportionment of costs for the elimination of the release or threatened release of solid waste among the persons responsible for solid waste under Section 361.271 shall be made according to" certain factors specified in that statute.

68.     The United States is a person who conducted a removal or remedial action at the NWIRP McGregor Site that was approved by the TCEQ and that was necessary to address a release or threatened release of solid wastes and hazardous wastes.

69.     The costs incurred by the United States to conduct the removal or remedial action at the NWIRP McGregor Site were "reasonable and necessary costs" within the meaning of TSWDA § 361.344(a).

70.     ConocoPhillips, as the successor in interest to Phillips Petroleum Co.'s liabilities associated with NWIRP McGregor, is a "person responsible for solid waste" at the NWIRP McGregor Site within the meaning of TSWDA § 361.271.

71.     As a person responsible for solid waste at the NWIRP McGregor Site within the meaning of TSWDA § 361.271, ConocoPhillips is liable to the United States for that portion of the costs incurred by the United States to conduct the removal or remedial action at the NWIRP McGregor Site apportioned by the Court pursuant to TSWDA §§ 361.344(d) and 361.343.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States of America, respectfully prays that this Court:

A.      Award Plaintiff a judgment against ConocoPhillips for all unrecovered response costs for which ConocoPhillips is liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a),

and that were incurred by the United States for activities conducted at or in connection with the NWIRP McGregor Site, including interest; related oversight costs; and related indirect, administrative, investigative, and enforcement costs;

B.     Award Plaintiff a judgment against ConocoPhillips for that portion of the costs incurred by the United States to conduct the removal or remedial action at the NWIRP McGregor Site apportioned by the Court pursuant to TSWDA §§ 361.344(d) and 361.343.

C.     Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), enter a declaratory judgment against ConocoPhillips that it is liable for future response costs that the United States may incur in connection with the NWIRP McGregor Site; and

D.     Grant the United States such other relief as this Court may deem appropriate.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


/s/ Michael T. Donnellan
MICHAEL T. DONNELLAN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington D.C.  20044-7611
Telephone:  (202) 514-4226
Fax:  (202) 514-0097
E-Mail:  michael.donnellan@usdoj.gov

        JOHN E. MURPHY
        United States Attorney
        Western District of Texas

        JOHN F. PANISZCZYN--Texas Bar # 15443805
        Assistant United States Attorney
        Western District of Texas
        United States Attorney's Office
        601 NW Loop 410, Suite 600
        San Antonio, TX  78216
        Telephone:  (210) 384-7100
        Telefax:  (210) 384-7105
        Email:  John.Paniszczyn@usdoj.gov

**OF COUNSEL:**
U.S. Department of the Navy Office of General Counsel
PAUL L. OOSTBURG SANZ
General Counsel

RICHARD L. GREEN
Senior Trial Attorney
Department of the Navy
Office of General Counsel Navy Litigation Office
720 Kennon Street SE Bldg. 36, Rm. 233
Washington Navy Yard, D.C.  20374-5013
Telephone:  (202) 685-6982
Fax:  (202) 685-7036 or 7037
E-mail:  richard.l.green@navy.mil