

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF TEXAS

## WACO DIVISION

**FILED**

SEP 3 0 2012

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. W-11-CV-167 |
| CONOCOPHILLIPS COMPANY,<br>    Defendant. | §<br>§<br>§ | |

## O R D E R

This action arises out of the Government's cleanup of solid wastes and hazardous substances at the former Naval Weapons Industrial Reserve Plant in McGregor, Texas and adjacent areas.  The Government seeks to recover costs associated with that cleanup from Defendant ConocoPhillips Company ("ConocoPhillips") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, and the Texas Solid Waste Disposal Act, Texas Health & Safety Code Ann. ("TSWDA") §§ 361.001 to 361.966 (  Defendant has filed a Motion to Dismiss the Government's claims.  Having reviewed the briefs submitted by the parties, the Court Defendant's motion is meritorious and should be granted.

## I. BACKGROUND

The underlying facts are not in dispute.  The Government operated a Naval Weapons Industrial Reserve Plant[1] in McGregor, Texas ("the McGregor Site") during World War II.  After the War, ownership of the plant was transferred to non-governmental owners.  However, federal operations were revived on a portion of the original site around 1952 and continued through 1995.  The Rocket FuelsDivision of Phillips Petroleum Company (predecessor to ConocoPhillips) operated on the site from 1952 to 1958 under contract from the U.S. Air Force.  Under the contracts with the Government, ConocoPhillips designed and produced jet-assisted take-off rockets ("JATOs"), which were designed to provide extra thrust to large military aircraft, and solid fuel rocket propellant.  The manufacturing and other processes generated waste materials consisting of solvents, lubricants and waste oils, paint sludges, and propellant.  A number of other companies operated various heavy industries on the site until 2007 when all of the land was conveyed to the City of McGregor.

The Government's complaint notes the following:

> 30.    In May 1978, the Navy began soil investigation at NWIRP McGregor.  The objectives were to identify any soil contamination, evaluate any adverse effects to agricultural activities from the contaminants, and recommend clean-up procedures. The investigation evaluated conditions at four locations, but the primary focus was on pesticide contamination in what became known as Area G.
>
> 31.    Beginning in summer 1981, the Navy commenced an Initial Assessment Study and produced a report dated March 1983.  The Initial Assessment Study identified fourteen potentially contaminated locations and recommended that seven of those locations be subject to further study. Additional study was performed in the seven locations and a report dated

---

[1]    The plant was also formerly known as the Blue Bonnet Ordnance Plant, as Air Force Plant 66, and as Naval Industrial Ordnance Plant.

August 1983 was prepared. Of the seven locations recommended for further study, three were determined to have sufficient contamination to warrant cleanup.

32.    In 1989, state environmental officials conducted a Resource Conservation and Recover Act ("RCRA"), 42 U.S.C. § 9601 et seq., Facility Assessment ("RFA") at NWIRP McGregor. The RFA identified four solid waste management units ("SWMUs") that required a RCRA permit and six SWMUs as having a high potential for release to the environment. The RFA recommended that the Navy conduct a FCRA Facility Investigation ("RFI") at these units to determine the nature and extent of any soil and/or groundwater contamination. From this point forward, remediation activities related to solid and hazardous waste at NWIRP McGregor were conducted under the Texas Industrial Hazardous Waste Corrective Action Program.

33.    In December 1991, the Navy completed the Final Preliminary Report for the RFI. The report focused on eight units at the site including the six RFI units identified in the RFA and two additional units. In November 1994, a RCRA Facilities Investigation, Preliminary Final Report was issued. Of the eight units evaluated, seven were recommended for further investigation and one was recommended for no further action. Additional field activities occurred in 1995 and 1996 and a Final RCRA Facility Investigation Report was issued in February 1996 which included specific recommendations for further characterization of contamination at the units covered by the report.

34.    In order to satisfy requirements related to the planned transfer of NWIRP McGregor to the City of McGregor, the Navy conducted a base-wide Environmental Baseline Survey ("EBS") from September 1995 to September 1996. An EBS is required by Dept. of Defense policy for all transfers of real property. The purpose of the EBS is to evaluate the entire property for its suitability to transfer, including identification of contaminated versus uncontaminated property pursuant to or consistent with CERCLA Section 120(h)(4), 42 U.S.C. § 9620(h)(4). At NWIRP McGregor, the EBS Report also served as one of the studies used to characterize environmental hazards for potential cleanup. While some locations were deemed suitable for transfer to the City of McGregor, other locations were found to require additional investigation and/or cleanup.

35.    In July 1998, the City of Waco collected samples from water sources nears NWIRP McGregor and detected perchlorate contamination. Significant public concern, including concerns about potential perchlorate contamination of nearby public water supplies, prompted the Navy to immediately begin collecting data on both onsite and offsite perchlorate contamination. Available data was summarized in a report issued in September 1999. The Navy continued to investigate perchlorate contamination through collection of surface water samples and installation of monitoring wells.

3

36.     In February 1999, the Texas Natural Resources Conservation Commission (later renamed the Texas Commission on Environmental Quality ("TCEQ")) sent a letter to the Navy requiring the Navy to propose and implement "Interim Stabilization Measures" designed to address off-site migration of perchlorate. Pursuant to state requirements, the Navy submitted a Draft Interim Stabilization Measure Evaluation in June 1999 which was approved by Texas.  Pursuant to the approved document, a large, broadly focused on and offsite perchlorate investigation was conducted.  In addition, the Navy constructed the following Interim Stabilization Measures designed to address off-site migration of perchlorate:

Area M Groundwater Collection Trenches:  These trenches collected perchlorate contaminated groundwater before it flowed off-site.  A lagoon to hold collected groundwater was constructed in 2000. Heavy rainfall in December 2000 overloaded the storage capacity for collected groundwater and, by March 2001, the Navy had expanded Lagoon A, constructed Lagoon B, and installed temporary storage tanks. Various techniques for treating the collected groundwater were evaluated and eventually a fluidized bed reactor was selected.  Also, the Navy evaluated the addition of organic material to the trench as a means of facilitating biological treatment of perchlorate.

Area M Soil Treatment Cells: Perchlorate treatment cells were constructed.    The  treatment  cells  were  designed  to  facilitate bioremediation  of  perchlorate  contaminated  soil.    Initially,  soils excavated from Area M were placed into the treatment cells and later tested to determine the effectiveness of the treatment technique. Later, the cells were also used to treat perchlorate contaminated soils from Areas F. H., and T.

Area F Phyto Pilot Test:  The Phyto Pilot Test evaluated whether  cottonwood  trees  planted  in  the  path  of  perchlorate contaminated  groundwater  would  be  an  effective  treatment technology.

Area F Biotrench Pilot Test:  Biotrenches were constructed in Area F in order to pilot test this treatment technology.  A biotrench is a trench placed in the path of perchlorate contaminated groundwater and  filled  with  organic  material.      Bacteria  which  break  down perchlorate  flourish  in  the  trench  and  perchlorate  levels  are substantially reduced.  A different mix of organic constituents was placed in each trench in order to evaluate its effectiveness.  The pilot test demonstrated that the treatment technique was effective and, ultimately, it was used as part of the remedy in many area of the NWIRP McGregor Site.

Area T Perchlorate Contaminated Soil Removal:  Perchlorate contaminated soils excavated from Area T were placed in the Area M Soil treatment cells.

37.     Groundwater investigations continued in several phases to collect data necessary to assess all groundwater contaminants and to evaluate risk to human and ecological receptors. Those investigations were documented in a series of reports submitted by the Navy to TCEQ. The final report submitted by the Navy pursuant to the February 1999 letter from the Texas Natural Resources Conservation Commission was dated August 2004 and titled *Groundwater Investigation Report, Phase III*. TCEQ approved that report on February 24, 2005.

38.     At the same time the Navy was conducting Interim Stabilization Measures related to perchlorate, it also continued investigations related to the 1996 EBS. Investigations related to areas as to which the Navy determined it did not have sufficient information to characterize environmental hazards were referred to as the Gray Areas Investigation ("GAI"). A separate GAI was conducted for each such Area of NWIRP McGregor and separate, Area-specific Response Action Plans ("RAPs") were submitted to the state for approval.

39.     The primary chemicals of concern identified in soil at the NWIRP McGregor Site include: volatile organic compounds ("VOCs"); semi-volatile organic compounds ("SVOCs"); polyaromatic hydrocarbons ("PAHs"); polychlorinated biphenyls ("PCBs"); total peroleum hydrocarbons ("TPH"); metals; and perchlorate. Contaminated soil did not extend beyond the plant boundaries. The primary chemicals of concern identified in groundwater include VOCs, explosives, and perchlorate. Groundwater contamination extended beyond the 1995 plant boundaries in four areas. The primary chemicals of concern identified in surface water (primarily Harris Creek, Tributary M, Tributary S, and Station Creek) included perchlorate.

40.     On October 3, 2006, TCEQ issued Post-Closure Order Docket No. 2006-0347-IHW to the U.S. Department of the Navy ("the 2006 PCO"). The 2006 PCO required Navy to undertake all actions required by the terms and conditions of the PCO including the Technical Requirements specified in Attachment A, Tchnical Requirements.

Government's Complaint, pp. 7-12.

The waste materials disposed of at the NWIRP McGregory Site by Defendant contained perchlorate and trichloroethylene ("TDC"), a VOC.

Defendant asserts the Government's complaint should be dismissed because the contracts between Phillips and the Government relieved it of any liability and, alternatively, because the Government's claims are barred by limitations.

## II. MOTION TO DISMISS

When considering a dismissal for failure to state a claim upon which relief may be granted, the Court accepts as true "all well-pleaded facts" and views them in the light most favorable to the plaintiff. *See Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). However, a plaintiff must allege specific facts, not conclusory allegations. *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir.1989). Conclusory allegations, as well as unwarranted deductions of fact, are not admitted as true. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir.1992). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim for relief that is *plausible* on its face." *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added); *see also In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009).

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.*, quoting *Twombly*.

6

"Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina*, 495 F.3d at 205 (quoting *Twombly*). However, the Court need not accept as true legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal*, at 1949. Only those complaints which state a plausible claim for relief survive a motion to dismiss. *Id.* at 1950. In making this determination, the reviewing court must "draw on its judicial experience and common sense." *Id.* at 1950.

### III.  DISCUSSION

A. Contract Terms. As noted, Defendant operated under a series of contracts between it and the Government. The terms of those are similar, but the Court will focus on the two noted by Defendant:  (1) the "facilities" contract dated December 3, 1953 (Defendant's Exhibit B); and (2) a rated-order production contract dated June 15, 1953 (Defendant's Exhibit B-2).  Clause 14 of the facilities contract provides:

> A.   Contractor shall not be liable for any loss of or damage to the facilities provided hereunder or for expenses incidental to such loss or damage, except that the Contractor shall be responsible for any such loss or damage (including expenses incidental thereto). . . .

"Facilities" is defined as

7

Item 1 -   Such portions of the Air Force Plant No. 66 located at McGregor, Texas, as have been or may be designated by the Air Force Contracting Officer designated to give such authorizations as of such dates and times as are agreed to with him.

Item 2 -   Such Government-owned machinery and capital equipment (elsewhere herein referred to as "facilities") as have been or may be furnished to the Contractor by the Government for the solid jet assist take-off rocket development and production programs at the location designated in Part 3 hereof.

Part 3 identifies the location of the facilities: "Air Force Plant No. 66 at McGregor, Texas, and such other temporary locations including but not limited to sub-contractor locations as may be approved by the Contracting Officer."

The June 15 rate order contract provides:

(f)(i) The Contractor shall not be liable for any loss of or damage to the Government Property, or for expenses incidental in such loss or damage,. . . .

A Government contractor may be absolved of liability for a CERCLA cleanup if its contract with the Government includes a clause holding it harmless. *See E.I. Du Pont De Nemours v. United States*, 365 F.3d 1367 (Fed.Cir. 2004). When dealing with contracts which pre-date CERCLA, the clause must be either "[1] specific enough to include CERCLA liability or [2] general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims." *Id.*, at 1373 (quoting *Beazer E., Inc. v. Mead Corp.*, 34 F.3d 206, 210 (3d

8

Cir. 1994)). The clause at issue in the *Du Pont* case was entitled "Indemnification Clause" and provided, in pertinent part, "[T]he Government shall hold [Du Pont] harmless against any loss, expense (including expense of litigation), or damage (including damage to third persons because of death, bodily injury or property injury or destruction or otherwise) of any kind whatsoever arising out of or in connection with the performance of the work. . . ."

The damages clause in the facilities contract would seem to absolve Defendant of liability for any damage which occurs to Government facilities at MWIRP McGregor. Under the regulations in force at the time of the contract, the definition of "industrial facility" included, but was not limited to, "real property and rights therein." 16 Fed. Reg. 4311, 4312 (May 10, 1951 (codified at 32 C.F.R. § 412.101-6 (Rev. 1951)). The rate order contract does not include the same language. That contract excuses liability for "Government property," which would encompass more than just facilities. These sections are broad enough, therefore, to protect Defendant from liability under CERCLA.

Even if the contractual provisions do not exclude liability, Defendant is entitled to dismissal additionally because limitations bars its claim.

B. Limitations. An action for recovery of remediation costs under CERCLA must be commenced within six years after "initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B). Section 9601(23) defines "remedial" actions as: "consistent with permanent remedy taken instead of or in

9

addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." Types of remedial actions listed include: "storage, confinement, perimeter protection using dikes, trenches or ditches, clay cover, neutralization cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment."

The foregoing are the types of actions the Government notes were undertaken by the Navy at the latest beginning in 2000. The Government's complaint further notes that the Navy has been investigating contamination at NWIRP for more than 30 years, although its initial investigation was for pesticides. The Government argues that its "Interim Stabilization Measures" were removal not remedial actions. However, the label is irrelevant because the actions taken by the Government, including all of the trenches and lagoons and storage pools, falls within the definition of remedial. The limitations defense applies equally to the Government's claims under Texas law. Accordingly, it is

**ORDERED** that Defendant's Motion to Dismiss is **GRANTED**.  It is further

**ORDERED** that any additional motions not previously ruled upon by the Court

are **DENIED**.

SIGNED this 30 day of September, 2012.


**WALTER S. SMITH, JR.**
**United States District Judge**

11